**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| In the Matter of: EAST COAST FOODS, INC., | No. 21-55967 |
| *Debtor*, | D.C. No. 2:20-cv-10982-MWF |
| ------------------------------ | |
| CLIFTON CAPITAL GROUP, LLC, | ORDER AND AMENDED OPINION |
| *Appellant*, | |
| v. | |
| BRADLEY D. SHARP, former Chapter 11 Trustee, | |
| *Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted September 2, 2022
Submission Withdrawn September 26, 2022
Resubmitted May 2, 2023
Pasadena, California

Filed May 8, 2023
Amended September 14, 2023

Before:  Milan D. Smith, Jr. and Ryan D. Nelson, Circuit
Judges, and Gershwin A. Drain,[*] District Judge.

Opinion by Judge R. Nelson

## SUMMARY[**]

### Bankruptcy

The panel reversed the district court's order affirming the bankruptcy court's enhanced fee award to the trustee in a funded Chapter 11 bankruptcy and remanded with instructions to dismiss creditor Clifton Capital Group, LLC's appeal for lack of Article III standing.

Clifton was chair of an official committee of unsecured creditors appointed by the Office of the United States Trustee to monitor the activities of debtor East Coast Foods, Inc., manager of Roscoe's House of Chicken & Waffles.  The bankruptcy court appointed Bradley D. Sharp as Chapter 11 trustee.  Clifton objected to Sharp's fee application, but the bankruptcy court awarded the statutory maximum fee.  Clifton appealed.  The district court concluded that Clifton had standing to appeal, and it

---

[*] The Honorable Gershwin A. Drain, United States District Judge for the Eastern District of Michigan, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

remanded. On remand, the bankruptcy court again awarded the statutory maximum. Clifton again appealed, and the bankruptcy court this time affirmed.

Addressing standing, the panel wrote that the Ninth Circuit historically bypassed the Article III inquiry in the bankruptcy context, instead analyzing whether a party is a "person aggrieved," as a principle of prudential standing. The court, however, has returned emphasis to Article III standing following *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), in which the Supreme Court questioned prudential standing.

The panel held that Clifton lacked Article III standing to appeal the fee award because it failed to show that the enhanced fee award would diminish its payment under the bankruptcy plan, and thus it failed to establish an "injury in fact." The panel concluded that Clifton's injury was too conjectural and hypothetical, and Clifton did not show that the fee award impaired the likelihood or delayed the timing of its payment. The panel concluded that the Chapter 11 plan did not relate to a limited fund because there was no finite amount of assets from which all creditors could be paid. Rather, the plan was a reorganizing plan that proposed to pay all allowed claims in full from the debtor's ongoing operations and non-estate sources. The panel held that, given the detailed plan, which guaranteed payment to creditors plus interest, and the net equity in the plan, the district court clearly erred in finding that the estate was a limited fund and that there were not sufficient funds to pay back all the creditors. Thus, Clifton's likelihood of payment was not impaired. The panel also concluded that Clifton did not suffer injury to the timing of its payment because Clifton's alleged harms were conjectural, and it remained possible that Clifton would be paid within the plan's initial

estimated window.  Accordingly, Clifton currently lacked an injury in fact.

## COUNSEL

Anthony Bisconti (argued), Bienert Katzman Littrell Williams LLP, Los Angeles, California; Steven J. Katzman, Bienert Katzman Littrell Williams LLP, San Clemente, California; for Appellant.

John N. Tedford IV (argued) and Uzzi O. Raanan, Danning Gill Israel & Krasnoff LLP, Los Angeles, California, for Appellee.

## ORDER

The opinion filed on May 8, 2023, and appearing at 66 F.4th 1214, is amended as follows:  On slip opinion page 4, lines 7–8, delete <Plan's assets contained within the Plan Collateral Package> and replace with <Collateral Package>.

On page 13, line 6, delete footnote 9.

On page 13, line 8, replace footnote 10 with <The disclosure statement requires that the plan include a classification of claims and how each class of claims will be treated under the plan.  *See* 11 U.S.C. § 1123.  Creditors whose claims are "impaired" generally vote on the plan before it is approved by the bankruptcy court.  *See id*. at § 1126.  Here, however, Clifton waived that right in a stipulation approved by the bankruptcy court and the plan was subsequently approved pursuant to § 1128.>.

On page 14, line 10, delete <Plan's assets contained within the Plan> and replace with <Package>.

On page 16, line 6, delete <Given Clifton's consent to the Plan, and b> and replaced with <B>.

With these amendments, Judges M. Smith and R. Nelson vote to deny the petition for rehearing en banc, and Judge Drain so recommends. The full court was advised of the petition for rehearing en banc, and no judge of the court has requested a vote on whether to rehear the matter en banc. The Petitions for Rehearing and Rehearing En Banc are DENIED. No further petitions for rehearing will be accepted.

---

**OPINION**

R. NELSON, Circuit Judge:

Creditor Clifton Capital Group, LLC challenges the district court's order affirming the bankruptcy court's enhanced fee award of over $1 million dollars to the trustee in a funded bankruptcy. Because Clifton has failed to show that the enhanced fee award will diminish its payment under the bankruptcy plan, Clifton lacks standing. We thus reverse the district court's order finding standing and remand with instructions to dismiss the appeal for lack of Article III standing.

I

This is not a normal bankruptcy. Roscoe's House of Chicken & Waffles is a landmark Los Angeles restaurant chain. Building on a staple menu predating the American

Revolution—Thomas Jefferson served his guests chicken and waffles—Roscoe's has garnered celebrity attention since opening in 1975. President Obama enjoyed chicken wings and a waffle there in 2011, with "Obama's Special" added to the menu.[1] Several movies have referenced Roscoe's.[2] And numerous songs have memorialized the restaurant, including one by Ludacris who suggests that the listener "roll to Roscoe's and grab somethin' to eat."[3] Despite its cultural ubiquity, even Roscoe's was not immune to a $3.2 million judgment in a racial discrimination case.[4] This significant judgment, along with other debt, threatened to impair Roscoe's ability to pay its creditors.

But fear not. The public can still indulge in Roscoe's famous soul food. As part of the bankruptcy plan, the restaurants remain open and founder Herb Hudson has guaranteed payment to Roscoe's creditors. As a failsafe,

---

[1] Adrian Miller, *The Layered Legacy of Roscoe's House of Chicken & Waffles*, RESY Blog (Sept. 8, 2020) https://blog.resy.com/2020/09/the-layered-legacy-of-roscoes-house-of-chicken-waffles/.

[2] *See id*. ("The restaurant has gotten a mention in films including: *Tapehead* (1988), *Swingers* (1996), *Jackie Brown* (1997), *Rush Hour* (1998), *Soul Plane* (2004). In 2004, Roscoe's got more than a mention on the big screen: It got its own eponymous feature-length film.").

[3] LUDACRIS, CALL UP THE HOMIES (Def Jam Recordings 2008).

[4] *See Beasley v. East Coast Foods, Inc. et. al.*, No. BC509995 (L.A. Sup. Ct.); *see also* Shan Li, *Parent Company of Roscoe's House of Chicken and Waffles Files for Bankruptcy Protection*, LA Times (Mar. 29, 2016) https://www.latimes.com/business/la-fi-roscoes-chicken-waffles-bankruptcy-20160329-story.html.

Snoop Dogg suggested buying the chain to keep it in business.[5]

In 2016, East Coast Foods, Inc. (ECF), manager of the four Roscoe's locations, filed for Chapter 11 bankruptcy. The Office of United States Trustee appointed an official committee of unsecured creditors (Committee) to monitor ECF's activities, of which Clifton Capital Group, LLC (Clifton) was named chair.  After an examiner found that ECF could not meet its fiduciary obligations, the court appointed Sharp as trustee, the de facto head of ECF for two years.

The Committee and ECF's principal submitted a Chapter 11 bankruptcy plan (the Plan), effective September 2018. The Plan granted $450 per hour plus expenses for Sharp's services as trustee.

The Plan guaranteed the creditors full payment with interest secured by a "Collateral Package," which included all of the ECF's assets, and up to a $10 million contribution from Hudson.  The Plan's appraiser estimated the value of the Collateral Package at over $39.2 million with $23.4 million of net equity, far exceeding the claims to be paid under the Plan.

In his final fee application filed in October 2018, Sharp requested $1,155,844.71, the maximum allowable under the fee cap statute, 11 U.S.C. § 326(a).  This amount represented the lodestar (1,692.2 hours worked times an hourly rate of

---

[5] Farley Elliott, *Snoop Dogg Says He'll Save Roscoe's Chicken N' Waffles if it Comes to That*, LA Eater (Mar. 31, 2016) https://la.eater.com/2016/3/31/11338382/snoop-dogg-buy-roscoes-chicken-waffles.

$448.50, for $758,955.50) plus a 65% enhancement for exceptional services.

Clifton objected in the bankruptcy court, arguing the fee cap was not presumptively reasonable as the record did not support an enhancement beyond the lodestar. The court disagreed, holding that the fee cap was presumptively reasonable and, in the alternative, that the case was exceptional and merited deviation from the lodestar.

Clifton then appealed to the district court and moved to strike the Fee Order. Sharp countered that Clifton lacked standing to appeal because it was not a "party aggrieved." The district court found Clifton aggrieved because there was insufficient capital in the estate to pay all creditors. *In re E. Coast Foods, Inc.*, No. CV 18-10098, 2019 WL 6893015, at *3 (C.D. Cal. Dec. 18, 2019). It held that "[b]ecause the increased compensation to the Trustee will further subordinate Clifton Capital's claim, the Court concludes that Clifton Capital is directly and adversely affected by the Final Fee Order." *Id.* The district court further held that the lodestar was the starting point for reasonable compensation and vacated and remanded for the bankruptcy court to award fees equal to the lodestar or "make detailed findings sufficient to justify a higher amount." *Id.* at *4, 6.

On remand, the bankruptcy court again found that Sharp was "entitled to an enhancement because the results in this case were truly exceptional." The bankruptcy court again awarded the statutory maximum. Clifton again appealed and the district court this time affirmed. Clifton now appeals to this court.

II

The question of whether a party has standing is a threshold issue that must be addressed before turning to the merits of a case. *Horne v. Flores*, 557 U.S. 433, 445 (2009). To appeal a bankruptcy court's order, a party must establish Article III standing and that it is "aggrieved" by the order. *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983).

We review Article III standing determinations de novo. *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1098 (9th Cir. 2022). But we review the factual determination that Clifton was a person aggrieved for clear error. *In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1191 (9th Cir. 2018).

III

A

Our authority under Article III is dispositive. Because the Constitution limits our jurisdiction to "cases" and "controversies," standing is an "essential and unchanging" requirement. *In re Sisk*, 962 F.3d 1133, 1141 (9th Cir. 2020) (quoting U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Accordingly, a party must establish an Article III case or controversy before we exert subject matter jurisdiction. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction." (citation omitted)).

In the bankruptcy context, we have historically bypassed the Article III inquiry, instead analyzing whether a party is a "person aggrieved." *See Fondiller*, 707 F.2d at 443. This standard is a prudential requirement initially found within the Bankruptcy Act of 1898, which permitted appeal by any "person aggrieved by an order of a referee." 11 U.S.C. §

67(c) (1976) (repealed 1978). The "person aggrieved" standard was designed to limit appeals in bankruptcy proceedings because such cases invariably implicate the interests of various stakeholders, including those not formally parties to the litigation. *See Fondiller*, 707 F.2d at 443. Even after Congress repealed and replaced the Bankruptcy Act of 1898, however, we continued to apply the "person aggrieved" standard.**[6]** *See id.*; *In re Com. W. Fin. Corp.*, 761 F.2d 1329, 1334 (9th Cir. 1985).

It is unclear why we continued to apply the person aggrieved rule in the absence of the statute providing the basis for doing so. We appear to have recast the pre-1978 statutory standard and applied it as a principle of prudential standing. But the Supreme Court has since questioned prudential standing, noting it "is in some tension with [the Court's] recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014)). Still, our bankruptcy cases have historically addressed prudential standing with little attention to Article III standing. *See, e.g.*, *Fondiller*, 707 F.2d at 441–43; *In re Int'l Env't Dynamics, Inc.*, 718 F.2d 322, 326 (9th Cir. 1983); *Klein v. Rancho Mont. De Oro, Inc.*, 263 F.2d 764, 772 (9th Cir. 1959); *Com. W. Fin.*, 761 F.2d at 1334.

After the Supreme Court's decision in *Driehaus*, however, we have returned emphasis to Article III standing.

---

[6] The Bankruptcy Reform Act of 1978 replaced the Bankruptcy Act of 1898. It governs the relationship between creditors and debtors when debtors can no longer pay their debts. Pub. L. No. 95-598, 92 Stat. 2549 (codified at 11 U.S.C. § 101).

*See, e.g.*, *Sisk*, 962 F.3d at 1141–43.  And determining our Article III jurisdiction before any prudential considerations does not offend our precedent.  *See, e.g.*, *In re P.R.T.C., Inc.*, 177 F.3d 774, 777–79 (9th Cir. 1999) (addressing Article III standing before person aggrieved prudential standing).  We thus first examine Article III standing, which we find lacking here.

B

As the party invoking federal jurisdiction, Clifton "bears the burden of establishing" the elements of Article III standing.  *Lujan*, 504 U.S. at 561.  A party must establish "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Horne*, 557 U.S. at 445 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original)). Clifton must therefore show that it has: (1) suffered an "injury in fact" that is concrete, particularized, and actual or imminent, (2) the injury is "fairly traceable" to the defendant's conduct, and (3) the injury can be "redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61 (alterations in original omitted).

1

Injury in fact is the "[f]irst and foremost" of the three standing elements.  *Sisk*, 962 F.3d at 1142 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). Clifton argues that it suffered an injury-in-fact because the Plan established the expectation that it would receive full payment of its claim, which has not yet occurred and which the Fee Order exacerbates.  The Plan estimates that Clifton

would "receive a *pro rata* share of Available Cash[7] in the annual sum of $1,816,701 in 2022, $2,996,321 in 2023, and $634,634 in 2024 . . . " To date, Clifton notes that this totals millions of dollars in payments that have not been made. Clifton argues that the Fee Order's grant of the $400,000 trustee bonus harms both the likelihood and timing of any payment by further subordinating it.

This, Clifton contends, suffices as an injury 'fairly traceable' to the wrongful conduct of the excessive fee award because its "injury need not be financial," *P.R.T.C.,* 177 F.3d at 777 (citation omitted), and because, under 11 U.S.C. § 330, payment of the fee award has priority and must be paid in full before unsecured creditors like Clifton receive any distribution. Clifton thus argues that it suffered a traceable and redressable injury in fact because a favorable decision would result in the excessive fees being returned to the ECF estate to pay out claims, and therefore would "increase the likelihood and timing" of payment to Clifton.

Sharp counters that Clifton's alleged injury is too conjectural and hypothetical to establish an injury in fact because there is no diminished likelihood that Clifton will be paid in full. The Plan's Collateral Package[8] guarantees Clifton full payment with interest. Sharp further argues that

---

[7] "Available Cash" is defined as cash in the estate from various sources, *less* (among other things) "the amount necessary or estimated and reserved to pay in full [] any Allowed Administrative Expense Claims," which includes the Trustee's awarded compensation pursuant to the Fee Order. *See* 11 U.S.C. § 503(b)(2) (providing that an administrative expense claim includes "compensation and reimbursement awarded under [11 U.S.C. § 330(a)].").

[8] As discussed below, the Collateral Package protects against any risks of nonpayment and includes all of the Reorganized Debtor's assets.

Clifton cannot claim injury arising from the Plan's estimates because Clifton approved the Plan understanding that the timing of its distributions depended on the allowed amounts of senior claims, meaning payment could be delayed by any increase in any Allowed Non-Subordinated Claims. Thus, Sharp asserts that Clifton's alleged harm is no harm at all because Clifton's payment is certain, and the only question at issue is when payment will occur.

2

We conclude that Clifton's alleged injury is too conjectural and hypothetical to establish an injury in fact for Article III standing. We similarly conclude that Clifton is wrong that the fee award both impaired the likelihood and delayed the timing of its payment. The district court erroneously concluded that the fee award would further subordinate Clifton's claim.

a

We first address the likelihood of payment. The district court concluded that Clifton had standing because it was an aggrieved party. Noting that Clifton had not been paid on any of its Allowed Claim, the court adopted Clifton's argument that "[t]here are not yet enough funds on hand to pay all creditors, including Clifton Capital, in full" and that "there are outstanding contingencies under the Plan that must occur before those funds become available." *E. Coast Foods*, 2019 WL 6893015, at *3. Sharp pointed out, however, that because Clifton was guaranteed 100% payment of its alleged claim under the Plan, it was not aggrieved. *Id.* at *2–3.

The district court seemingly concluded, without explicitly stating, that the Plan concerns a limited fund. *See*

*id.* at \*3.  It found that the alleged lack of sufficient capital to pay all claims would further subvert Clifton's claim and thereby adversely affect its payment.  *Id.*  Therefore, the district court held that Clifton was aggrieved because it was appealing an order disposing of assets from which it (the claimant) seeks to be paid.  *Id.* (citing *Int'l Env't Dynamics*, 718 F.3d at 326).

The district court relied on our precedent that in cases involving competing claims to a limited fund, "a claimant has standing to appeal an order disposing of assets from which the claimant seeks to be paid."  *Id.* (quoting *P.R.T.C.*, 177 F.3d at 778).  A limited fund necessarily concerns a finite pool of assets to pay claims, thus creating the risk that creditors will not be paid, either in full or at all.  In the limited fund context, changes to any allotment or transfer of funds, including an enhanced fee award, would materially affect the likelihood of any potential payment and therefore directly implicate creditor interests.  Along these lines, we have found a party aggrieved when limited fund plans "eliminated" a party's interest in estate assets from which they sought payment.  *Com. W. Fin.*, 761 F.2d at 1335.  We have also found standing when a bankruptcy court's order transferred all significant assets out of the estate, effectively barring a creditor's claim.  *P.R.T.C.*, 177 F.3d at 778–79.

In contrast, in *Klein*, we found that plaintiffs challenging an order seeking payment of their attorney fees lacked standing because the plan specified that there were "additional monies" available, even though the plan did not expressly contemplate payment of their claims.  263 F.2d at 771–72.  The plaintiffs challenged orders confirming a plan which they asserted disregarded compensation for legal services to which they were entitled.  *See id*.  Plaintiffs

argued that because the plan disposed of the estate's assets, the plan rendered payment impossible.  *Id*.

Our court rejected both arguments.  Even though the plan did not expressly contemplate the plaintiffs' compensation claims, the plan provided that "additional monies are available if need(ed) . . . to . . . pay off the unsecured creditors their claims in full."  *Id*. at 772 (alterations in original).  At judgment, the court noted that "if the sum which is actually available to pay appellants' claims as finally allowed proves insufficient, the court has only to enforce the provisions of the plan . . . requiring that additional monies be deposited or accrued in the registry."  *Id.*

Even though *Klein* was decided under the "person aggrieved" standard, it is most analogous to this case.  As in *Klein*, the Plan here does not relate to a limited fund because there is no finite amount of assets from which all creditors could be paid.  *See id*.  Rather, "the Plan is a reorganizing plan that **proposes to pay all Allowed Claims in full** (unless otherwise agreed) from the Debtor's ongoing operations and non-Estate sources."

The Plan's mandatory "disclosure statement" which outlines the Plan, its risk factors, and its financial projections bolsters this conclusion.[9]  *See* 11 U.S.C. §§ 1121, 1125.  The Plan makes clear that Clifton's claim will be paid in full with

---

[9] The disclosure statement requires that the plan include a classification of claims and how each class of claims will be treated under the plan.  *See* 11 U.S.C. § 1123.  Creditors whose claims are "impaired" generally vote on the plan before it is approved by the bankruptcy court.  *See id*. at § 1126.  Here, however, Clifton waived that right in a stipulation approved by the bankruptcy court and the plan was subsequently approved pursuant to § 1128.

interest after all other allowed unsecured claims and penalty claims are satisfied. Clifton understood these terms: its principal Sam White testified that "the Plan was proposed to move this case forward and to ensure 100% payment to creditors as quickly as possible."

Indeed, the Plan's promise of full payment with interest is unconditionally guaranteed and secured by a "Collateral Package," which includes all of ECF's assets. The Debtor's principal (Hudson) is responsible for contributing up to $10 million to the Plan to affect the payment of claims. ECF is required to contribute to the Plan roughly $110,000 per month plus the excess free cash flow from its post-confirmation operations. Additional funds are available from other entities owned by Hudson which are to contribute about $130,000 per month to the Plan. Payments from ECF and Hudson will continue until all claims are paid in full with interest.

The Package further ensures enough available collateral to pay the Plan's covered claims in full, plus a 35% equity cushion. The Plan's appraiser estimated the value of the Package at over $39.2 million with 23.4 million of net equity, exceeding the claims to be paid under the Plan by about $17.3 million (the 35% equity cushion).

Given the detailed Plan which guarantees payment to creditors plus interest, and the net equity in the Plan, the district court's finding that the estate is a limited fund and that "there are not sufficient funds to pay back all the creditors," is clearly erroneous. *E. Coast Foods*, 2019 WL 6893015, at *3. Moreover, even if Sharp receives the contested $400,000 bonus, this will not impact Clifton's ability to be paid because there are other sources from which to make Clifton's payment at the appropriate time.

b

We similarly disagree with Clifton's assertion that it suffered injury to the timing of its payment. In agreeing to the Plan, Clifton knew from the start that the timing of its payment could be longer or shorter than the Plan's initial estimates depending on the amounts owed to senior claimants. The Disclosure estimates that all Allowed Unsubordinated Claims would be paid in full within four years, by mid-2022. But the Statement also notes that "[t]he term of the Plan can be shorter or longer than expected depending on the amount of the Allowed Claims."

The Plan further estimates that allowed claims could be paid within six years, but "for every $1 million change in allowed claims, the term of the Plan will change by 3.3 months." Sharp points to specific unresolved allowed claims that have delayed payment, such as a pending priority claim by the IRS for over $10.2 million which it asserts Clifton knew was present at the time the Plan was approved, and for which $15 million is being held in reserve to pay. Sharp also points to the effects of COVID-19 and a missing $1.5 million payment from Hudson as reasons that Clifton has not been paid yet. Sharp has entered into a series of forbearance agreements to give Hudson additional time to pay the balance due. No evidence suggests that payment will not occur. And in any event, this potential default is not traceable to the Fee Order itself.

Given these uncertainties, the Plan estimated that the distribution timeframe for subordinated claims, such as Clifton's, would be between 2022 and 2024. But these were only estimates. Ultimately, the Plan's guarantee that Clifton will be paid with interest precludes a finding of an injury in

fact now even though these estimates thus far have proven inaccurate.

Clifton's alleged harms are thus conjectural at best. It remains possible that Clifton will be paid within the Plan's initial estimated window before the end of 2024. Because this period has not passed, Clifton has failed to establish that the timing of its payment has been harmed beyond what the Plan initially provided. Since the Plan did not guarantee Clifton payment by a specific date (it merely provided an estimated window which has not passed), and the estimated timing of payment was subject to change based on priority claims, Clifton has not yet shown an actual injury. That is particularly true where Clifton is entitled to interest on the payments that are due. As such, Clifton has failed to establish the negative impact of any delayed payment not already addressed by the Plan.

This remains the case even where Sharp receives his payment before Clifton is paid. The Plan anticipates fulfilling Clifton's claims even if Sharp receives the challenged bonus. As we held in *Klein*, the availability of additional funds to satisfy plaintiffs' claims foreclose standing. 263 F.2d at 771. The same is true here.

This is not to say that no potential remedy would exist should the Plan prove insufficient. We agree with our prior analysis in *Klein* that Clifton, if necessary, could sue to enforce those provisions of the Plan. At that time, there may be an actual injury that is both fairly traceable and would be easily redressable by ordering additional money deposited into the estate to pay Clifton's claims. *See id*. at 766. But such facts do not presently exist. And standing must exist from the start of an action. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170

(2000) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence. . . ."). As such, Clifton has failed to establish actual injury thus far and therefore lacks Article III standing to challenge the Fee Award.[10]

IV

Because Clifton currently lacks an injury in fact, we reverse the district court's order and remand with instructions to dismiss the appeal for lack of Article III standing.

**REVERSED.**

---

[10] Because Clifton lacks Article III standing, we need not address the prudential "person aggrieved" standard. *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222–23 (9th Cir. 1998) (holding that a suit seeking declaratory judgment must first pass constitutional and statutory muster as presenting a case-or-controversy before the court exercises its prudential discretion).